Wilkinson-Beane, Inc. v. Commissioner.
Wilkinson-Beane, Inc. v. Commissioner
Docket No. 2325-67.
United States Tax Court
T.C. Memo 1969-79; 1969 Tax Ct. Memo LEXIS 217; 28 T.C.M. (CCH) 450; T.C.M. (RIA) 69079; April 21, 1969, Filed *217 Petitioner operated an undertaking business. It kept a stock of caskets on hand. The Commissioner recomputed its taxable income for 1963-1965 by the accrual method of accounting and reporting, thereby rejecting petitioner's cash receipts and disbursements method. Held: The stock of caskets was a significant income-producing factor, and the caskets were purchased and sold as merchandise within the contemplation of sections 1.446-1 and 1.471-1, Income Tax Regs. As such the Commissioner did not violate sections 446 or 471 by recomputing petitioner's taxable income on the accrual basis. Arthur H. Nighswander, 507 Main St., Laconia, N.H., for the petitioner. Joel Gerber, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent, using the accrual method of accounting, made the following determinations with respect to petitioner's income tax: Year
Deficiency
Overassessment
1963
$9,383.92
1964
$1,099.53
1965
876.28
Since petitioner has not placed in issue adjustments made in its claimed charitable contributions for 1964 and 1965, the only issue presented is whether respondent properly required petitioner, who has consistently used the cash basis of accounting and *218 reporting, to compute its income tax on the accrual basis for the years 1963, 1964 and 1965. The recomputation resulted in the overassessment for 1964. Respondent recomputed petitioner's taxes for 1963, 1962 and 1961, giving effect to the allocation provisions of section 481(b). [1]
Findings of Fact Some of the facts have been stipulated. The stipulation with the exhibits attached are incorporated herein by this reference. Wilkinson-Beane, Inc., petitioner herein, was incorporated in New Hampshire on January 19, 1961. It operates an undertaking business in Laconia, N.H. Petitioner filed its income tax returns for 1963, 1964 and 1965 as a cash-basis, calendar-year taxpayer with the district director of internal revenue at Portsmouth, N.H.
Petitioner and its predecessors have operated an undertaking business in Laconia since 1860. Sometime prior to 1945 Dana S. 451 Beane, Sr., (hereinafter Dana, Sr.), a licensed funeral director, became manager of the business which was then owned by Lewis H. Wilkinson. Dana, Sr., purchased the business from Wilkinson in 1947 and continued to operate it as a *219 proprietorship until incorporation in 1961. Roger H. Beane (hereinafter Roger) and Donald F. Beane (hereinafter Donald) are sons of Dana, Sr. Roger has been licensed to practice funeral directing and embalming in New Hampshire since 1943. He joined his father and Wilkinson in 1945 and has been with the business ever since. He currently is president of petitioner. Donald, also a registered funeral director and embalmer, is treasurer and Dana, Sr., is secretary. All three were full-time employees and officers of petitioner during the years in issue. Dana, Sr., wanted Roger and Donald to own the business. He decided to use the corporate form as a means of transferring ownership to them. Upon incorporation in 1961 petitioner received all the assets of the business except cash on hand in excess of $1,000 and real estate. Included in the transfer were accounts receivable, caskets, supplies, equipment, furniture, furnishings, office equipment and motor vehicles plus current liabilities and chattel mortgages as of December 31, 1960. On December 22, 1961, Roger and Donald each received 10 shares of petitioner's stock from Dana, Sr. Between December 22, 1961, and April 18, 1966, Dana, Sr., transferred *220 the balance of petitioner's outstanding stock to Roger and Donald, who then became petitioner's only shareholders. Petitioner and its predecessor proprietorship have always kept their books and records and reported their Federal income taxes on the cash-basis method of accounting, reflecting receipts and expenditures when paid rather than when accrued. Dana, Sr., kept petitioner's books from 1961 through 1965. Dana S. Beane, Jr., (hereinafter Dana, Jr.), who is also a son of Dana, Sr., and a certified public accountant, prepared petitioner's income tax returns for the years 1961 through 1965. Petitioner advertised and provided complete funeral services. These services consisted of removal of the body to the funeral home, embalming and dressing the body, providing a casket selected by the family, furnishing the funeral home and chapel for family use, providing music, providing vehicles for transporting the casket and family in the funeral procession, directing the funeral, and providing counseling to the family regarding survivor's rights and benefits. The complete funeral service excluded certain items and services for which petitioner made a coincidental cash outlay and seprate charge, *221 such as for the vault, opening of the grave, newspaper notices, and gratuities paid to cleargymen. A single price was charged for the complete funeral service, and its components, including the casket. The various items were not identified separately in the billing. The additional cash items mentioned above were listed individually in the billings to clients. Petitioner's policy was to make its service available to all regardless of financial circumstances. This policy was in accordance with the ethics of the profession. The lower priced complete funeral services were available for institutional and welfare cases. In such cases the particular governmental agency involved fixed a maximum amount it would pay. This price ranged from about $175 to $300, which, at least in some instances, was less than petitioner's cost of providing the complete funeral service. Funerals for children were traditionally below cost. Petitioner also made less-than-cost, but somewhat finer, complete funeral services available to nonwelfare cases if the families could not afford the full price. Petitioner's most expensive complete funeral service was about $2,500. Such service occurred about once in every five *222 years on the average. The following schedule, which is typical of petitioner's business, shows the distribution of petitioner's cases in terms of charges for 1965: Dollar Amount
No. of Cases
$ 25.00
1
40.00
1
50.00
1
55.00
1
60.00
2
67.00
1
$ 75.00
1
80.00
1
88.55
1
91.50
1
93.30
1
100.00
1
121.00
1
175.00
6
$200.00
10
204.50
1
225.00
1
250.00
1
270.00
1
275.00
17
$280.00
1
300.00
1
420.00
1
437.00
20
495.00
3
541.78
1
593.00
9
627.00
5
$ 675.00
19
727.00
21
743.00
5
757.00
5
763.00
2
785.00
4
$ 797.00
2
845.00
17
950.00
1
1,095.00
1
1,165.00
2
1,575.00
2
$93,661.63
173 452 Some of the lower priced cases involved services other than complete funeral services such as removal of a body or embalming. In order for the business to make profits, petitioner had to charge amounts for the more expensive funerals that, on the whole, more than offset its costs for the below-cost funerals. Individually, the cost of caskets ran from about $30 each for the simpler caskets to about $500 each for the more elaborate ones. The cheaper caskets were included in the complete funeral services on the lower end of the price range. Cards showing the cost of complete funeral services were placed upon various caskets which were to be included in the complete funeral service. Noninstitutional *223 clients then were able to select the complete funeral service they desired by reviewing the cards and caskets on which the cards were placed. The finer, and thus more expensive, caskets were intended and used to induce people to pay a greater fee for the complete funeral service. Petitioner kept samples of interior materials so that noninstitutional clients could select that which pleased their tastes. Petitioner then prepared the casket interiors accordingly. Petitioner normally maintained an inventory of approximately 35 caskets, representing about 28 varieties of caskets, all of which were purchased from suppliers. This number of caskets was considered fairly large for an undertaking business. Petitioner's location, however, was relatively remote from casket suppliers thereby necessitating large casket inventories as a means of overcoming its inability to obtain deliveries quickly. This situation may be contrasted to that of a comparable undertaking business located near its source of supply. The latter business needs little or no casket inventory because its clients are normally able to view various types in a nearby supplier's warehouse or in a catalogue with the expectation of *224 quick delivery. The following is a schedule of the cost of petitioner's and its predecessor's caskets on hand as of December 31 of the years 1954 through 1965. The figures for 1961-1965 were reflected in inventories on petitioner's respective income tax returns as assets and were not taken into cost of goods sold for that year in determining petitioner's taxable income: Year Ending Dec. 31
Cost of Caskets on Hand
1954
$11,228.55
1955
8,918.80
1956
9,551.71
1957
9,665.45
1958
9,950.65
1959
8,463.70
1960
$8,439.75
1961
8,741.25
1962
8,476.00
1963
8,587.25
1964
7,597.15
1965
7,780.15
In the later years above, petitioner and its predecessor were able to reduce year-end casket inventories, at least in part, because of the ability of the business to lessen delays in delivery and to predict the needs of the business. Caskets were not necessarily moved out of inventory during the year they were purchased. If a particular style proved to be unpopular, it could not be exchanged. It might have been made over at considerable expense. Sometimes particular caskets were carried for long periods. Petitioner inventoried its caskets at actual cost, and deducted them during the year 453 in which petitioner paid for them. As caskets *225 were used, new orders were placed immediately by telephone except where there were extras in stock. Normally only one of each type of casket was kept in inventory except for some of the less costly caskets which usually were used in connection with low cost funerals such as those paid for by various governmental welfare agencies. For the years in issue petitioner listed the following "Cost of Operations" as its cost of goods sold on its income tax returns: 1963
1964
1965
Embalming supplies
$ 968.31
$ 843.70
$ 1,161.39
Funeral supplies
766.55
1,082.65
620.82
Suits and dresses
194.75
308.13
237.90
Vaults in graves
7,659.69
7,477.48
9,327.78
Caskets in graves * 20,052.83
16,330.89
17,883.39
$29,642.13
26,042.85
29,231.28
In order to remove uncollectable accounts from accounts receivable before the transfer to petitioner upon incorporation in 1961, the receivables of the proprietorship were written down by $39,213.68. This resulted in $21,697.83 of accounts receivable being transferred to petitioner upon incorporation. After the transfer, petitioner *226 had the following estimated amounts [2] of accounts receivable on December 31 of the respective years. These amounts include accumulated uncollectable accounts as well as the uncollectable accounts for the particular year. Column three sets forth the estimate of uncollectable accounts for the respective years: Year
Accounts
Yearly
Net
Receivable
Uncollectables *
Receivable
1961
$23,821.73
$2,941.36
$ 20,880.37
1962
30,170.05
2,441.40
24,787.29
1963
31,211.64
3,136.39
22,692.49
1964
29,947.62
2,951.20
18,477.27
1965
38,957.04
4,999.66
22,487.03 We are unable to determine what portion of petitioner's accounts receivable existing on December 31 of any year arose in prior years and what portion arose in a particular year, such as in 1963. However, because petitioner dealt heavily with estates its receivables were paid slowly. It incurred bad debts because of its policy of accepting all cases regardless of financial circumstances. Petitioner's gross receipts and taxable income reported on its income tax returns for 1961-1965, respectively, were as follows: *227 Year
Gross Receipts
Taxable Income
1961
$121,102.12
$ 6,805.05
1962
113,506.86
1,628.85
1963
129,898.72
9,012.34
1964
120,209.64
7,535.14
1965
121,574.92
888.07 These amounts, having been computed on the cash basis, do not include or account for any receivables arising in the respective year but not paid in that year nor for caskets to the extent caskets were paid for in another year. Historically, petitioner's business had been stable. Since the Laconia population had shown little growth, petitioner's gross receipts and the number of cases it handled had not increased very much. Neither Dana, Jr., nor Roger expected the business of petitioner to grow to any great extent. The Commissioner determined in his deficiency notice to petitioner "that the cash receipts and disbursements method of accounting employed by you * * * does not clearly reflect income and that the accrual method of accounting does clearly reflect your income." The major effect of the change to the accrual method was to include accumulated and current accounts receivables in income and to take caskets into inventory. Otherwise, there were no substantial changes in taxable income. The Commissioner adjusted petitioner's taxable income *228 as follows, representing the difference between its cash basis and accrual basis income: 454 1963
1964
1965
Accounts Receivable, December 31
$31,211.64
$29,947.62
$38,957.04
Reserve for Bad Debts (8,519.15)
(11,470.35)
(16,470.01)
Net Receivables
$22,692.49
$18,477.27
$22,487.03
Inventory, December 31 8,587.25
7,597.15
7,780.15
Total
$31,279.74
$26,074.42
$30,267.18
Less: Accounts Payable, December 31 0
0
0
Net Adjustment
$31,279.74
$26,074.42
$30,267.18
Less: Prior Years' Adjustment 0
31,279.74
26,074.42
Increase (Decrease) in Current Year's Income
$31,279.74
($5,205.32)
$ 4,192.76 $ 4,192.76 Ultimate Finding of Fact Purchases and sales of caskets as merchandise were significant income-producing factors in petitioner's business. Opinion Petitioner is in the undertaking business. It and its predecessor were on the cash basis of accounting and reporting. Respondent required petitioner to account for and to report its income on the accrual method for the years 1963 through 1965. We must determine whether this was properly done. To make this determination we must begin with section 446. Section 446(a) provides that: [taxable] income shall be computed under the method of accounting on the basis of which the taxpayer *229 regularly computes his income in keeping his books. Section 446(c) provides that subject to sections 446(a) and (b) a taxpayer may compute his income under certain methods of accounting including the cash receipts and disbursements method and the accrual method. It is stipulated that petitioner kept its books and reported its income on the cash basis method of accounting. Section 446(b), however, provides for exceptions to the general rule of section 446(a). Insofar as relevant here, section 446(b) provides that: if the method [of accounting] used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. The Commissioner has been delegated the authority to determine the method of accounting to be used in order to reflect income clearly. Section 1.446-1(a)(2) and (b)(1), Income Tax Regs., and section 301.7701-9(b), Proced. & Admin. Regs. Our basic inquiry thus boils down to whether petitioner's cash method of accounting clearly reflected its income. In addressing itself to this point, petitioner primarily questions respondent's position that petitioner's caskets *230 were the type of inventory which requires the use of the accrual method of accounting. Section 471 provides that inventories shall be taken when "in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer." [3] Under respondent's regulation, [4] *231 455 in order to reflect taxable income correctly, inventories are necessary in every case in which the production, purchase or sale of merchandise of any kind is an incomeproducing factor. Further, the regulations provide that the accrual method must be used with regard to the purchases and sales of such inventories. Petitioner contends that it conducted a service business which involved the supplying of caskets rather than the sale of merchandise. Petitioner does not seriously attack the regulations except to say that there may be cases in which inventories may be so slight that they would not *232 be significant income-producing factors. Unquestionably petitioner's business depended primarily upon the various services it provided. Petitioner's officers held licenses as funeral directors and embalmers and were actively engaged in their profession. That the caskets were furnished along with professional services, however, does not necessarily answer the question of what was the character of those caskets for purposes of section 446. We think that the caskets were income-producing factors and were, in effect, sold as a type of merchandise along with the various services insofar as petitioner's business was concerned. According to the record before us petitioner's fees for its complete funeral services were based primarily on the amount it had to pay for caskets and on the financial condition of its clients. Professional ethics and policy required petitioner to accept cases regardless of the financial condition of the client or the amount which institutional clients were authorized to pay. Fees for many cases were below cost and sometimes were uncollectable. Consequently, petitioner would have suffered constant losses had it not charged those who were financially able an amount *233 sufficient to overcome losses on nonpaying and low-paying cases. The record indicates, however, that the caskets were the means by which clients were induced to bear these higher fees. In complete funeral services provided to institutional clients the least costly caskets were furnished. For the information of individual clients cards were placed atop the various caskets displayed on petitioner's premises which cards set forth the price of complete funeral services. It appears that the particular type of casket primarily determined the price of the particular complete funeral service. Certainly petitioner has not maintained otherwise. The importance of caskets as an incomeproducing factor is further shown by the fact that petitioner displayed various interior materials for the caskets from which a client could choose an interior he desired. Thus despite the fact that caskets were never itemized or billed separately from the single price of the complete funeral service, they nevertheless constituted an important factor in the production of petitioner's income. To be sure, petitioner was a victim of its geographic circumstances. Because it was some distance from its source of supply, *234 it needed to maintain a relatively large variety of caskets in its inventory. Because of heavy demand for some varieties it often had two or three of these types on hand. Otherwise it could not obtain the particular desired casket when needed. This situation may be contrasted to that of those funeral businesses located near their sources of supply. Such businesses need few or no caskets on hand because their clients can select the desired casket from the supplier's warehouse or from a catalogue after which the business can obtain delivery quickly from a nearby warehouse. It is well to note that petitioner's caskets were not necessarily sold during the year they were purchased. Unpopular models might be on hand for an indefinite time because petitioner was unable to return them to the suppliers or to remodel them economically. When we compare the costs of caskets purchased during, and on hand at the end of, each year with the costs of goods sold and the receipts of petitioner's business, our perspective is enhanced. Thus the figures in the margin [5] show that the cost of caskets purchased each year constituted from 61.2 to 67.6 percent of the costs of goods sold for the years in issue *235 and amounted to 13.6 to 15.4 percent of cash basis receipts for the first five years of petitioner's 456 existence as well as for the years in issue. Also, ending inventories as reflected in the joint exhibits varied from $7,597.15 to $8,741.25 for the five years of petitioner's existence ranging from over one-third to over onehalf of the cost of caskets purchased for the respective years. The caskets certainly appear to be more than an insignificant factor in the production of petitioner's income. A similar analysis of the amount of accounts receivables indicates the potential extent to which taxable income was understated. The figures in the margin [6] show that the net amount of accounts receivable outstanding at the end of each year of petitioner's existence ranged from 15.4 percent to 21.8 percent of receipts reported on the cash basis; they ranged from 15.4 percent to 18.5 percent for the years *236 in issue. Obviously these figures do not show a completely accurate picture since they do not allow for inventory adjustments nor do they distinguish receivables carried over from prior years. However, we are unable to obtain a completely accurate perspective from this record. We think that these figures do provide a sufficient, though general, guide for us to conclude that significant or substantial amounts of income were not reflected in current income because of petitioner's use of the cash receipts and disbursements method of accounting instead of the more appropriate accrual method required by the regulations. Our discussion thus far indicates our feeling that the caskets are merchandise as contemplated by the regulations under sections 446 and 471. Given the circumstances presented here we think the caskets are embraced within the general notion of the term "merchandise." In trying to define merchandise we are not greatly aided by the code, regulations (see sections 1.471-1 *237 and 1.471-5, Income Tax Regs.), legislative history, the Commissioner's rulings or even the income tax case law for we have found no helpful discussion or definition of "merchandise" therein nor have the parties pointed us to one. The case law basically is concerned with when title to the merchandise passes. Various authorities in the accounting field speak of "merchandise" as being goods purchased in condition for sale, [7] goods awaiting sale, [8] articles of commerce held for sale, [9] and all classes of commodities held for sale. [10] We are not demeaning the honored profession of undertaking by holding that the caskets here involved were purchased for sale and sold as merchandise and must be so treated for income tax purposes. We fully recognize that petitioner was in the business of providing valuable services. But we think it would be anomalous to hold that a taxpayer in a service *238 business can have no merchandise even though he derives a substantial portion of his income from the regular purchase and sale of tangible personal property. We certainly have no basis for so restricting the application of the word "merchandise." It appears that Congress probably did not intend to exclude non-mercantile businesses from the reach of the predecessor of section 471. [11]
The soundness of our holding is emphasized by testimony of petitioner's president that petitioner displayed the various types of caskets and interiors in an effort to satisfy the varying tastes of those people who ordered funeral arrangements and the fact that burials could be accomplished without the use of a casket although he could not recall any such instance. In fact, it was by virtue of petitioner's physical treatment and handling of the caskets that they bore this particular and direct relationship to petitioner's pricing system for a complete funeral. By the same token, while petitioner's contention that *239 it sold complete funeral services rather than caskets is possibly valid in a professional sense, it is not well taken in 457 an economic sense. Petitioner's own argument recognizes that sales of caskets were included in sales of complete funeral services. There is nothing to indicate that title to the caskets did not pass (see section 1.471-1, Income Tax Regs.), and we must assume that title did pass. We thus cannot escape the conclusion that the caskets were a significant income-producing factor and were purchased and sold as merchandise. As such petitioner must inventory the caskets and account for its income on the accrual basis. Under sections 446 and 471 respondent must determine whether a taxpayer's method of accounting clearly deflects his income. He has the authority to prescribe a method of accounting and to require the use of inventories in order to reflect income clearly. In the regulations under these sections, as our discussion above indicates, respondent has provided that the accrual method must be used where inventories are necessary and that inventories are necessary where the production, purchase or sale of merchandise of any kind is an income-producing factor. We *240 are reading these statutory and regulatory provisions as forming a scheme of accounting as we think we must because of their statutory, regulatory and judicial history. Section 446 finds predecessors of similar import in section 41 of the Internal Revenue Code of 1939, and section 212(b) of the Revenue Act of 1918. See also section 13(d) of the Revenue Act of 1916. Section 471 finds such predecessors in section 22(c) of the Internal Revenue Code of 1939, [12]section 203 of the Revenue Act of 1921, and section 203 of the Revenue Act of 1918. The regulations under sections 446 and 471, quoted in footnote 4, supra, have forerunners under the 1939 Code containing similar language and import. [13] *241 We list this history also to emphasize the extent of its judicial as well as legislative acceptance concerning respondent's discretion. Generally the cases have recognized that the Commissioner has broad discretion to determine the proper method of computing income and whether inventories are necessary. Lucas v. Kansas Structural Steel Co., 281 U.S. 264 (1930); Michael Drazen, 34 T.C. 1070, 1076 (1960), appeal dismissed (C.A. 8, 1961); Caldwell v. Commissioner, 202 F. 2d 112, 114-115 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court; Welp v. United States, 103 F. Supp. 551, 555 (N.D. Ia., 1952), reversed on other grounds 201 F. 2d 128 (C.A. 8, 1953). See also H. Rept. No. 767, 65th Cong., 2d Sess., p. 24 (1918). Moreover, as pointed out in Iverson's Estate v. Commissioner, 255 F. 2d 1, 3-4 (C.A. 8, 1958), affirming 27 T.C. 786 (1957), rehearing denied 257 F. 2d 408 (C.A. 8, 1958), certiorari denied 358 U.S. 893 (1958), these regulations have been upheld consistently. *242 Herberger v. Commissioner,, 195 F. 2d 293 (C.A. 9, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 820 (1952); Caldwell v. Commissioner, supra; Welp v. United States, supra; Boynton v. Pedrick, 136 F. Supp. 888 (S.D.N.Y., 1954), affirmed 228 F. 2d 745 (C.A. 2, 1955), certiorari denied 351 U.S. 938 (1956). And we recognized the durable standing of the regulations in Ezo Products Co., 37 T.C. 385, 392 (1961), appeal dismissed (C.A. 3, 1962). See also David W. Hughes, 22 T.C. 1 (1954); and E.S. Iley, 19 T.C. 631, 636 (1952). Cf. Z. W. Koby, 14 T.C. 1103 (1950), appeal dismissed (C.A. 6, 1951). We find the analysis in Boynton v. Pedrick, supra, particularly appropriate. In discussing the predecessor provisions to sections 446 and 471 and the regulations thereunder, the District Court, at 136 F. Supp. 890-891, explained: The relationship between the two sections is critical. The power to require the use of a particular method of accounting to "clearly reflect income" is necessarily concomitant with the power to require the use of inventories "in order clearly to determine the income", if the use of inventories and a particular method of accounting are inextricably *243 intertwined. Caldwell v. Commissioner demonstrates this necessary connection: 458 "The use of inventories in computing income results in stating the expenses of a year's operations in terms of the cost of the goods actually sold during that year. Thus the profit from these operations will be stated accurately only if the income from all sales made during the year is taken into consideration. This requires use of the accrual method of determining income, since the cash receipts method obviously does not reflect the actual sales made during the year where, as in the present case, a substantial part of these sales * * * is made on credit." 202 F. 2d 114. We think this quotation accurately sets out the relationship between the current sections. Among other things, petitioner appears to have used its substantial inventories of caskets to help generate a significant amount of business on credit thereby further indicating we should hold for respondent. In arriving at our conclusion, we considered the often expressed idea that the presence of inventories does not necessarily require a change in a taxpayer's method of accounting where the inventories are inconsequential or consist primarily *244 of labor. Ezo Products Co., supra, 392. Petitioner relies heavily on this dictum and on Michael Drazen, supra, and Stanford R. Brookshire, 31 T.C. 1157 (1959), affirmed 273 F. 2d 638 (C.A. 4, 1960), certiorari denied 363 U.S. 827 (1960), which was cited by Ezo Products Co. Respondent also finds comfort in these cases. In Ezo Products Co., supra, we held that respondent properly changed the taxpayer's method of accounting from the cash to the accrual method. In so doing we recognized that in the particualr factual setting presented the amounts of inventory and accounts receivable were substantial and, therefore, within the obvious contemplation of the regulations. Here also we have determined that petitioner's inventories were significant and that it did a substantial amount of business on credit. In Michael Drazen, supra, petitioners amended their cash basis return for 1953 to report income for those years on the accrual basis without requesting permission to do so. The only adjustments made were to include inventories and accounts receivable in the returns. The Commissioner refused to allow the attempted change. Our decision for respondent was based on the requirement that a taxpayer *245 seeking to change his method of accounting must obtain the permission of the Commissioner. We were concerned about the need for consistency in accounting, and felt that petitioners posed the issue of whether they had proven that the cash method distorted income and that the accrual method reflected income clearly. We found that petitioners failed to demonstrate that income and expenses were improperly matched in 1953 and that the inventories were necessary in 1953. We did not find that the regulations here in issue applied. Instead the value of the inventory consisted largely of labor, and did not consist of raw materials or finished work. Our observation that "the mere presence of inventory does not necessarily mean that the cash method did not correctly reflect income," 34 T.C. at 1079, was not a disavowal of the regulations. In Stanford R. Brookshire, supra, we were faced with another situation in which a cash basis partnership changed to the accrual method for 1952. The Commissioner accepted the change and assessed a deficiency based upon adjustments for opening inventory and accounts receivable less accounts payable which represented amounts not previously taxed. As an alternative, *246 and solely for purposes of protecting the revenue, the Commissioner assessed deficiencies for 1950 and 1951 based on changing the business from the cash to the accrual accounting method. We held that the adjustments for 1952 were proper because petitioners failed to prove that the cash method distorted income prior to 1952, 31 T.C. 1164, 1166-1167. In so doing we pointed out that the mere existence of inventories did not prove distortion, and that the uncontroverted testimony by witnesses for both sides was that there was no distortion. In affirming that decision, the Court of Appeals observed that we had noted that "some reasonable flexibility must be permitted in determining when the purchase and sale of merchandise becomes such an income producing factor as to require the use of inventories and a change to an accrual method * * *." [Emphasis supplied.] Brookshire v. Commissioner, 273 F. 2d 638, 642 (C.A. 4, 1960). The Court of Appeals was particularly impressed with the fact that the voluntary attempt to change to the accrual method without making the adjustments proposed by the Commissioner would allow net income from accounts receivable to escape taxation and a double deduction *247 for inventory simply because the partnership for many years deliberately had kept its books on an accounting basis which it 459 presently contended was erroneous. In this context we hardly think that Wilkinson-Beane can derive comfort from the Brookshire case. Although not cited by either of the parties, there are three other pertinent cases bearing on the question of when inventories require the use of the accrual method. In Estate of Howard T. Roe, 36 T.C. 939 (1961), acq. 1962-1 C.B. 4, we noted the Brookshire line of cases. While we stated that there are instances when inventories can be used properly with the cash method, we also said that "This might well be true when the taxpayer is in a service business and the inventory is used in the business and not held primarily for sale." [Emphasis supplied.] Id. at 952. We have concluded, in the case at hand, that petitioner held the caskets for sale. Glenn v. Kentucky Color & Chemical Co., 186 F. 2d 975, 977-978 (C.A. 6, 1951), stated that the language in section 19.41-2, Regs. 103, was not mandatory [14] and to construe it as such would create a serious question of validity. This analysis spawned the language in the line of cases relied *248 upon by petitioner. The analysis in Glenn was dicta because the court viewed the issue as whether the taxpayer had kept its books on the cash or accrual basis, carefully pointing out that the Commissioner did not change the accounting method nor assert that the cash basis failed to reflect income clearly and that the deficiency determination was not based upon the use of inventory. Moreover, the phrase "For instance" on which the gratuitous analysis so heavily relied was dropped from the regulations under the 1954 Code, and thus the Glenn analysis is not particularly appropriate now. Theodore H. Beckman, 8 B.T.A. 830 (1927), cited by Stanford R. Brookshire, supra, and Michael Drazen, supra, also used the type of language on which petitioner relies. There the deficiency was determined by means of the cash method after the taxpayer stated that he had filed his returns on the cash basis. The Board held, in effect, that he failed to *249 prove that the cash method distorted his income. It must be remembered that our analysis of the above regulations and cases is in the context of the cash or accrual bases of accounting. We are not faced with a hybrid method. See, e. g., 2 Merten's, Law of Federal Income Taxation, sec. 16.03, pp. 6-7 (1967). We doubt that petitioner herein intended to dispute the adjustments given the finding that the change in accounting method was proper. [15] *250 We note that section 481(a) provides that a taxpayer's taxable income for the year for which the accounting method was changed shall take "into account those adjustments determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted * * *." Respondent's adjustments appear to have followed the dictates of section 481(a) and certainly petitioner has not proven otherwise. Further, the deficiency notice purports to compute the deficiency pursuant to section 481(b), and it is not challenged in this respect. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.↩
*. These figures represent the cost of caskets purchased in the designated year. Corresponding figures for 1961 and 1962 are $17,074.59 and $16,240.17, respectively.↩
2. The table of estimates was prepared by the Internal Revenue agent and was agreed to by petitioner.↩
*. After deduction for accumulated, uncollectable accounts receivable.↩
3. SEC. 471. GENERAL RULE FOR INVENTORIES. Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. ↩
4. § 1.446-1 General rule for methods of accounting. (a) General rule. * * * (4) * * * (i) In all cases in which the production, purchase, or sale of merchandise of any kind is an income-producing factor, merchandise on hand (including finished goods, work in process, raw materials, and supplies) at the beginning and end of the year shall be taken into account in computing the taxable income of the year. (For rules relating to computation of inventories, see sections 471 and 472, and the regulations thereunder.) * * * (c) Permissible methods - * * * (2) Special rules. (i) In any case in which it is necessary to use an inventory the accrual method of accounting must be used with regard to purchases and sales unless otherwise authorized under subdivision (ii) of this subparagraph. § 1.471-1 Need for inventories In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * *↩
5. ↩
Year
Cost of
CGS
% of CGS
Cash Basis
Caskets
Caskets
Receipts
as a %
Purchased
of Receipts
1961
$17,074.59
N/A
N/A
$121,102.12
14.1
1962
16,240.17
N/A
N/A
113,506.86
14.3
1963
20,052.83
$29,642.13
67.6
129,898.72
15.4
1964
16,330.89
26,042.85
62.7
120,209.64
13.6
1965
17,883.39
29,231.28
61.2
121,574.92
14.7
N/A - Not available
6. ↩
(A)
(B)
Year
Cash Basis Receipts
Net Receivables
(B) as a %
on Dec. 31
of (A)
1961
$121,102.12
$20,880.73
17.2
1962
113,506.86
24,787.29
21.8
1963
129,898.72
22,692.49
17.5
1964
120,209.64
18,477.27
15.4
1965
121,574.92
22,487.03
18.5
7. Finney and Miller, Principles of Accounting - Intermediate 223 (5th ed. 1959). ↩
8. Grady, Inventory of Generally Accepted Accounting Principles for Business Enterprises, An Accounting Research Study, No. 7 (1965). ↩
9. Kohler, A Dictionary for Accountants 311 (1597). ↩
10. Wixon, Accountants' Handbook 12.1 (4th ed. 1956).↩
11. "You have to have inventories to ascertain the profits in the mercantile and manufacturing and like businesses." [Emphasis supplied.] 56 Cong. Rec. Appendix 689 (1918) (remarks of Rep. Kitchin).↩
12. Section 41 of the 1939 Code states that "For use of inventories, see section 22(c)↩." 13. Secs. 39.41-2(a), 39.41-3(a) and 39.22(c)-1, Regs. 118; secs. 29.41-2, 29.41-3(1), and 29.22(c)-1, Regs. 111; secs. 19.41-2, 19.41-3(1), and 19.22 (c)-1, Regs. 103. Further, such cataloguing is also possible for regulations in effect prior to these. Arts. 22, 23 and 1611, Regs. 69; arts. 322, 323(1) and 101, Regs. 74; arts. 322, 323(1) and 101, Regs. 77; arts. 41-2, 41-3(1) and 22(c)-1, Regs. 86; arts. 41-2, 41-3(1) and 22(c)-1, Regs. 94; and secs. 41-2, 41-3(1) and 22(c)-1, Regs. 101. See also Lucas v. Kansas Structural Steel Co., 281 U.S. 264↩ (1930); 2 Merten's, Law of Federal Income Taxation, sec. 16.03, p. 4 (1967).
14. Section 19.41-2 included the following statement. emphasis supplied: "For instance, in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method."↩
15. Moreover, some rather ambiguous testimony by petitioner's certified public accountant seems to indicate that the accountant felt the computations were correct, given the propriety of the change in accounting methods.