T.C. Memo. 2019-103

UNITED STATES TAX COURT

KING SOLARMAN, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19969-17.                    Filed August 19, 2019.

Steve Mather and Lydia B. Turanchik, for petitioner.

Cassidy B. Collins and Christine A. Fukushima, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge:  With respect to petitioner's Federal income tax for its fiscal year ending April 30, 2015, the Internal Revenue Service (IRS or respondent) determined a deficiency of $1,929,212 and an accuracy-related penalty of $385,842.  Petitioner manufactures and sells solar equipment.  About 60% of the equipment it sold during the year at issue was sold in a single transaction for

[*2] $7,938,000.  Petitioner reported $2,268,814 in cash it received from that buyer during that year, but it excluded from its gross proceeds the balance of the purchase price, which took the form of a promissory note.

Petitioner contends that it used the cash method of accounting and that, under the cash method, it properly deferred the balance of the purchase price to future years when additional cash was received.  Alternatively, petitioner contends that it should be permitted to report its sale proceeds using the installment method of accounting.  See sec. 453.[1]

Respondent replies that petitioner elected the accrual method of accounting, that it actually used that method, and that it was required to use that method because it was "necessary to use an inventory."  See sec. 1.446-1(c)(2)(i), Income Tax Regs.  Under the accrual method, respondent contends, the entire sale price was immediately includible in petitioner's gross income consistently with the "all events" test.  See sec. 1.451-1(a), Income Tax Regs.  Respondent rejects petitioner's alternative theory, noting that the installment method cannot be used for a "disposition of personal property of a kind which is required to be included in the

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round most monetary amounts to the nearest dollar.

**[*3]** inventory of the taxpayer if on hand at the close of the taxable year." Sec. 453(b)(2)(B).

We conclude that respondent has the better side of these arguments. We will accordingly sustain the deficiency determined by the IRS after giving effect to a $125,554 concession by respondent.[2] But we find that petitioner is not liable for the accuracy-related penalty.

FINDINGS OF FACT

Some facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated by this reference. Petitioner had its principal place of business in California when it filed its petition.

A.   Petitioner's Business

Petitioner is a C corporation whose sole shareholder and chief executive officer (CEO) is Michael Cung. Mr. Cung is a Taiwanese national, and English is his second language. After getting his bachelor's degree Mr. Cung began working in the solar industry around 2007. He attended San Jose City College to learn more about the solar equipment business.

---

[2]Respondent has conceded (and we agree) that the gross proceeds adjustment determined in the notice of deficiency included proceeds of $125,554 that petitioner had already reported. We will direct the parties to submit Rule 155 computations in light of that concession.

[*4]  Mr. Cung incorporated King Solarman, Inc. (petitioner or KSI), in May 2011.  KSI is principally engaged in the manufacture and sale of mobile solar-powered lighting units (solar towers).  Each unit consisted of a wheeled cart containing a battery pack and a tower with an extendable solar-power panel.  The panel would be exposed to the sun during the day, charging the battery to provide light-emitting diode (LED) illumination after dark.  The units came in standard models (two- or four-wheeled carts incorporating lithium or lead-acid batteries).  Customers had the option of adding certain accessories, such as security cameras or Wi-Fi/4G LTE access.  The units were commonly used to provide lighting for parking lots, building and highway construction sites, and remote work locations.

Mr. Cung estimated that KSI since its inception has fabricated and sold about 900 solar towers.  These units have many component parts, which KSI generally purchased from third parties.  Components included trailers, batteries, battery gauges, secure battery boxes, solar panels, extendable masts, multiple antenna types (depending on signal and power required), LED light fixtures, circuit breakers, timers, inverters, control boxes, remote control and monitoring devices, electrical components, various metal items, and cabling.  Optional accessory components included a mast assembly with an accompanying security camera (customers could choose among three available models) and LED floodlights.

[*5] B.         Petitioner's Tax Returns

KSI filed timely a Form 1120, U.S. Corporation Income Tax Return, for each relevant year.  Schedule K, Other Information, of Form 1120 instructs the taxpayer to "[c]heck accounting method" and report its business activity.  On its first return, for its fiscal year ending (FYE) April 30, 2012, KSI checked the box for "Accrual" and reported its business activity as "wholesale trade."  It reported its business activity code as 423990, which identifies "Other Miscellaneous Durable Goods Merchant Wholesalers" in the North American Industry Classification System (NAICS).  On its returns for FYE 2013, 2014, and 2015, KSI consistently stated that it was using the accrual method of accounting and reported the same business activity code and NAICS code.  At no point did KSI file with the IRS Form 3115, Application for Change in Accounting Method.

Each of the four returns included a Schedule L, Balance Sheet per Books, with attached statements that reported (among other things) current assets and liabilities.  For FYE 2015, the tax year at issue, petitioner's reporting included the following entries:

[*6]

| Item | Amount |
|---|---|
| Opening accounts payable | $202,454 |
| Closing accounts payable | 189,454 |
| Opening credit card payable | 9,283 |
| Closing credit card payable | 62,761 |
| Closing accrued payroll | 12,764 |
| Closing payroll tax liabilities | 1,436 |
| Opening State tax payable | 5,530 |
| Closing State tax payable | 27,283 |
| Closing Federal tax payable | 14,731 |

KSI's returns for the three previous years included Schedules L and attached statements that likewise reported accounts receivable, accounts payable, credit card payables, Federal tax payable, and State tax payable.

KSI attached to each return a Form 1125-A, Cost of Goods Sold. This form instructs the taxpayer to determine cost of goods sold (COGS) by listing its opening inventory; adding thereto its purchases, costs of labor, and other applicable costs; and subtracting its closing inventory from the total thus derived.

KSI did not prepare its Forms 1225-A consistently with these instructions. It listed no opening or closing inventory for any year. Although the inputs to its COGS should have included material and labor costs, it did not report either item accurately. For FYE 2013 it listed cost of labor as $2,739,994, left the other lines

**[*7]** blank, and showed COGS in an amount equal to its cost of labor. For FYE 2012, 2014, and 2015, it listed purchases as $1,090,503, $3,332,621, and $5,665,900, respectively, left the other lines blank, and showed COGS in amounts equal to its purchases.

The COGS petitioner reported on Form 1125-A for FYE 2015 appears to be the sum of the following yearend general ledger accounts:

| Account | Amount |
|---|---|
| 500 Purchases | $3,112,387 |
| 501 Purchases--Agent | 2,354,548 |
| 610 Broker Fee | 190,965 |
| 634 Legal & Professional | 8,000 |
| COGS | 5,665,900 |

KSI excluded from its COGS all of the wages it paid the employees who worked on assembly of the solar towers. But it appears to have included those labor costs among its deductions. On line 13 of its Form 1120, KSI reported a deduction of $92,667 for salaries and wages. It included on line 26, among its other deductions, a deduction of $109,701 for outside services. The general ledger account for outside services shows 244 payments, mostly in amounts under $1,000, to at least 120 distinct individuals, who appear to have been laborers.

[*8]   KSI's general ledger for FYE 2015 includes various entries that are consistent with its use of the accrual method of accounting.  It had general ledger accounts for "accrued salaries," "accounts payable," "payroll taxes payable (Federal)," "payroll taxes payable (State)," "payroll tax payable (FUTA)," and "income tax payable."  General ledger account 154, captioned "Equipment - Solar Light Tower," actually appears to capture inventory because it has no matching sub-account for accumulated depreciation.  Its entries include "solar light tower," "solar trailer," and "solar panel."  The general ledger total for that account, $1,062,241, was zeroed out on December 31, 2014, and "reclassif[ied] to cost."

C.     The Transaction at Issue

During 2014 Mr. Cung negotiated a deal for the lease of 162 solar towers.  Each tower had the same basic design and core components.  The towers were capable of accepting optional accessories, such as an LED floodlight and a security camera with mast assembly.  But KSI did not include these accessories on the 162 towers that were the subject of the lease.

On the advice of his accountant Mr. Cung structured his side of the transaction through a network of related entities.  KSI executed a purchase agreement for the 162 units with Solarman (Indion) Fund I, LLC (Fund).  The Fund was an investment vehicle in which income and expense items were initially allocated

[*9] 99% to passive investors and 1% to King Solarman LLC, an entity wholly owned by Mr. Cung. The Fund immediately leased the towers to an intermediary company, which immediately subleased the towers to King Solarman LLC, which then subleased the towers to the end users. The transaction was apparently structured this way in order to transfer bonus depreciation and tax credits to the Fund's passive investors while minimizing their exposure to the economic risk of the leasing transaction.

The purchase agreement between KSI and the Fund was executed on December 29, 2014, with Mr. Cung signing for both parties. The total purchase price was $7,938,000, payable in two cash installments totaling $2,143,260 and a promissory note for the $5,794,740 balance. The note was secured by the solar towers and called for 240 monthly payments of $31,388.50. During FYE 2015 the Fund paid the two cash installments and made four monthly payments on the note, yielding total cash payments of $2,268,814 ($2,143,260 + (4 × $31,388.50)). At the close of FYE 2015, KSI's general ledger showed "net sales" to the Fund of $2,268,814, "deferred sales" of $5,669,186, and "accounts receivable/note" of $5,669,186.

The purchase agreement provided that title to (and risk of loss on) the solar towers transferred from KSI to the Fund upon delivery of the note and the Fund's

[*10] first payment. Those events occurred on December 29 and 30, 2014, respectively. The Fund acquired legal possession of the solar towers and immediately recorded them as depreciable assets on its balance sheet.

Under the terms of the sublease agreement, King Solarman LLC, the sublessee, was required to perform all maintenance and repairs on the solar towers. It charged the end users for all repairs and maintenance and earned a profit by performing those services. KSI warranted to the Fund that the solar towers would remain "in good working order" for 10 years. KSI in turn had warranties from the manufacturers of the principal components of the solar towers (battery pack, battery backup system, inverter, trailer platform, etc.). These warranties had terms ranging between 2 and 25 years. KSI agreed to assign these warranties to the Fund or (if they were not assignable) to take necessary steps to exercise the warranties on the Fund's behalf.

Apart from the 162 solar towers sold to the Fund, KSI during FYE 2015 derived gross proceeds of $4,335,324 from the sale of solar equipment to other parties. KSI appears to have recorded sales transactions on more than 20 separate occasions during that year. Some transactions were recorded in the general ledger as "customer deposits," and other transactions were recorded as "sales." Some "deposits" were later reclassified as "sales." The exact number of these sales trans-

[*11] actions and the identities of the buyers are difficult to determine from the record.

D.     Tax Reporting and IRS Examination

KSI filed a timely Form 1120 for FYE 2015 that reported the following:

| Item | Amount |
|------|--------|
| Gross receipts | $6,790,824 |
| Less, COGS | (5,665,900) |
| Gross profit | 1,124,924 |
| Plus, interest income | 232 |
| Less, deductions | (869,903) |
| Taxable income | 255,253 |

KSI included in its reported COGS--as "purchases" or "purchases/agent"--100% of the material costs attributable to the 162 solar towers it sold to the Fund.  And it included among its deductions--either as "salaries and wages" or as "other deductions"--100% of the labor costs attributable to the 162 solar towers.  But it excluded from its gross receipts $5,669,186, the portion of the purchase price that it did not receive in cash during FYE 2015.

The IRS selected KSI's 2015 return for examination.  The revenue agent (RA) concluded that KSI was required to include in its gross receipts, under the accrual method of accounting, the entire purchase price paid for the 162 solar tow-

[*12] ers.  The RA recommended the assertion of a substantial understatement penalty under section 6662(b)(2), and his recommendation was approved in writing by his immediate supervisor on September 6, 2016.

On June 28, 2017, the IRS issued KSI a timely notice of deficiency determining a $5,794,400 adjustment to gross receipts and an accuracy-related penalty. The notice concluded that petitioner "must use an accrual method of accounting for purchases and sales since * * * [petitioner] must use an inventory per IRC [section] 471."  Under the accrual method of accounting, the notice continued, petitioner was required to include the entire amount of sale proceeds for the 162 solar towers "since all the events have occurred to fix the right to receive the income with reasonable accuracy."  Respondent concedes that the $5,794,400 adjustment was overstated by $125,554, viz., the sum of the monthly note payments ($31,388.50 × 4) that KSI received during FYE 2015 and included in its gross receipts.

On September 21, 2017, KSI timely petitioned for redetermination of the deficiency and the penalty.  It contended (among other things) that:  (1) it properly employed the cash method of accounting for FYE 2015, (2) the IRS premised the deficiency on an asserted change of accounting method, and (3) the accounting method that respondent asserted was improper because it would not clearly reflect

**[\*13]** KSI's income.  In his answer respondent denied that he had acted to change petitioner's accounting method, alleging that "petitioner elected the accrual method of accounting and that respondent's determination is consistent with that method."

OPINION

I.    Burden of Proof

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Carter v. Commissioner, 784 F.2d 1006, 1008 (9th Cir. 1986).  But respondent bears the burden of proof "in respect of any new matter, increases in deficiency, and affirmative defenses" pleaded in his answer.  Rule 142(a).  A new argument advanced by respondent in his answer or at trial "is not a 'new matter' if it 'merely clarifies or develops [the] Commissioner's original determination without requiring the presentation of different evidence, being inconsistent with [the] Commissioner's original determination, or increasing the amount of the deficiency.'"  Kikalos v. Commissioner, 434 F.3d 977, 982 (7th Cir. 2006) (alterations in original) (quoting Friedman v. Commissioner, 216 F.3d 537, 543 (6th Cir. 2000), aff'g T.C. Memo. 1998-196), aff'g T.C. Memo. 2004-82; see Stewart v. Commissioner, 714 F.2d 977, 990-991

**[*14]** (9th Cir. 1983), aff'g T.C. Memo. 1982-209; Shea v. Commissioner, 112 T.C. 183, 197 (1999).

KSI contends that respondent should bear the burden of proof on the accounting issue because he raised a "new matter" in his answer. That is so, in petitioner's view, because respondent alleged in his answer that "petitioner elected the accrual method of accounting," whereas the notice of deficiency had determined only that KSI "must use" the accrual method of accounting. Respondent denies that he has raised a new matter, urging that his answer "merely clarifie[d] or develop[ed]" the position stated in the notice of deficiency, see Kikalos, 434 F.3d at 982, while being completely consistent with it.

We suspect that respondent has the stronger side of this argument. His contention that petitioner elected the accrual method of accounting is the flip-side of petitioner's contention that it used the cash method of accounting. The principal evidence relevant in evaluating both arguments is the same--KSI's tax returns and general ledger--and those documents are in the record and would be central components of the case in any event.

We need not resolve the burden-of-proof issue, however, because we decide all relevant questions on the basis of the preponderance of the evidence. Because our disposition "would be the same regardless of which party had the burden of

**[*15]** proof," we need not decide where that burden lies.  Considine v.

Commissioner, 74 T.C. 955, 966 (1980); see FRGC Inv., LLC v. Commissioner,

89 F. App'x 656 (9th Cir. 2004) (finding no need to decide who had the burden of

proof when the preponderance of the evidence favored the Commissioner), aff'g

T.C. Memo. 2002-276; Knudsen v. Commissioner, 131 T.C. 185, 189 (2008)

(same), supplementing T.C. Memo. 2007-340.

II.    Governing Legal Principles

Section 446(a) provides that "[t]axable income shall be computed under the

method of accounting on the basis of which the taxpayer regularly computes his

income in keeping his books."  "The term 'method of accounting' includes not on-

ly the overall method of accounting * * * but also the accounting treatment of any

item."  Sec. 1.446-1(a)(1), Income Tax Regs.

Among the permissible overall methods of accounting are the cash receipts

and disbursements method (cash method) and the accrual method.  Id. para.

(c)(1)(i) and (ii).  The cash method generally requires the taxpayer to recognize

income in the year of receipt (constructive or actual) and to deduct expenses for

the taxable year in which the expenditures are actually made.  Id. subdiv. (i); sec.

1.461-1(a)(1), Income Tax Regs.  The accrual method requires the taxpayer to

recognize income when "all the events have occurred that fix the right to receive

[*16] the income and the amount of the income can be determined with reasonable accuracy." Sec. 1.446-1(c)(1)(ii)(A), Income Tax Regs. This is commonly called the "'all events' test." See, e.g., United States v. Gen. Dynamics Corp., 481 U.S. 239, 242 (1987). Liabilities are recognized when they satisfy the all events test and "economic performance" has occurred. Sec. 461(h); sec. 1.461-1(a)(2)(i), Income Tax Regs.

"In any case in which it is necessary to use an inventory[,] the accrual method of accounting must be used with regard to purchases and sales," unless otherwise authorized by the Commissioner. Sec. 1.446-1(c)(2)(ii), Income Tax Regs. Generally speaking, a taxpayer must account for inventories under section 471 for any trade or business "in which the production, purchase, or sale of merchandise is an income-producing factor." Sec. 1.471-1, Income Tax Regs.; see Jim Turin & Sons, Inc. v. Commissioner, 219 F.3d 1103, 1106 (9th Cir. 2000), aff'g T.C. Memo. 1998-223; Drazen v. Commissioner, 34 T.C. 1070, 1079 (1960).

A taxpayer generally "may adopt any permissible method of accounting" when filing the first return for a particular trade or business. Sec. 1.446-1(e)(1), Income Tax Regs. "The method used by the taxpayer in determining when income is to be accounted for will generally be acceptable if it accords with generally accepted accounting principles, is consistently used by the taxpayer," and satisfies

[*17] the regulations.  Id. para. (c)(1)(ii)(C).  But "no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income." Id. para. (a)(2).

While a taxpayer is free to adopt any permissible method of accounting initially, he is not at liberty to change that method unilaterally.  "[A] taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary."  Sec. 446(e).  A change in method of accounting includes "a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item."  Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  Section 446(e) gives the Commissioner wide latitude to grant or deny requests for changes of accounting method, including "the power * * * to grant retroactive changes."  Barber v. Commissioner, 64 T.C. 314, 319 (1975); see Hawse v. Commissioner, T.C. Memo. 2015-99, 109 T.C.M. (CCH) 1511, 1517.

A taxpayer using the accrual method of accounting may defer recognition of accrued income to the extent it qualifies for treatment under the "installment method."  Sec. 453(a).  Under the installment method, a portion of the gross profits from a disposition of property is deferred, based on the ratio of total unpaid install-

[*18] ments to the total contract price of the installment sale.  See sec. 453(c).

With exceptions not relevant here, the installment method is not available for

proceeds resulting from "[a]ny dealer disposition" or from "[a] disposition of

personal property of a kind which is required to be included in the inventory of the

taxpayer if on hand at the close of the taxable year."  Sec. 453(b)(2).

III.    Analysis

Respondent contends that petitioner in fact adopted, and was required to

use, the accrual method of accounting and did not seek or receive permission from

the Commissioner to do otherwise.  Under the accrual method, respondent urges,

all proceeds that KSI derived from sale of the 162 solar towers were includible in

gross income currently under the "all events" test.  Respondent rejects petitioner's

alternative position, contending that KSI was ineligible to report its proceeds un-

der the installment method because the solar towers constituted personal property

of a kind required to be included in inventory.  We agree with respondent on all

counts.

A.    Election of the Accrual Method

Petitioner explicitly elected the accrual method of accounting on its return

for FYE 2012, the return filed for its first taxable year.  It confirmed its adoption

of the accrual method on each of its subsequent returns, including its return for

**[*19]** FYE 2015, the tax year at issue.  Respondent represents that petitioner has since filed two more tax returns, each reflecting its use of the accrual method.  That method is clearly permissible for petitioner, engaged as it is in the business of selling personal property at wholesale.  Petitioner has bound itself to the accrual method by consistently electing to use it and by failing to secure the Commissioner's consent to do otherwise.  See sec. 446(e).  To allow petitioner to escape its elections would contravene the purpose of section 446(e) and "impose burdensome uncertainties upon the administration of the revenue laws."  Pac. Nat'l Co. v. Welch, 304 U.S. 191, 194 (1938); see Wierschem v. Commissioner, 82 T.C. 718, 724-726 (1984).

Petitioner suggests that its election of the accrual method may have been inadvertent, but we find no factual support for that contention.  Each of petitioner's tax returns was prepared by a certified public accountant (CPA).  Petitioner was engaged in the business of selling personal property at wholesale, and businesses like this are normally required to maintain inventories and use the accrual method.  If the CPA believed that petitioner's election was mistaken, it is logical to assume that he would have advised petitioner to seek permission to change its method.  Petitioner did not call its CPA to testify at trial, and we find no support for the notion that its election was inadvertent.

[*20] In a related vein petitioner contends that, despite its election of the accrual method, it actually used the cash method in keeping its books. We find little if any factual support for this counterintuitive proposition. Petitioner did not introduce into evidence its general ledger (or any other bookkeeping records) for FYE 2012, 2013, or 2014. There is thus no record evidence regarding petitioner's internal bookkeeping practices for the first three years of its existence.[3]

For FYE 2015, petitioner's general ledger includes various entries that are consistent with its use of the accrual method, e.g., accounts captioned "accrued salaries," "accounts payable," "payroll taxes payable (Federal)," "payroll taxes payable (State)," "payroll taxes payable (FUTA)," and "income tax payable." Many of these same items, as well as "credit card payables," appeared on the Schedules L and attached statements included in petitioner's tax returns for FYE 2015 and prior years.[4]

---

[3]Petitioner asserts that it would have entered into evidence its general ledgers for FYE 2012-2014 if it had been aware of respondent's position that it used the accrual method. But petitioner was fully apprised of respondent's position on this point no later than the date of respondent's answer, which alleged that "petitioner elected the accrual method of accounting."

[4]The IRS permits cash method taxpayers to deduct certain expenses when charged to a credit card. See Rev. Rul. 78-38, 1978-1 C.B. 67 (charitable contributions); Rev. Rul. 78-39, 1978-1 C.B. 73 (medical expenses). But petitioner's reporting credit card payables as current liabilities is as consistent with its use of

(continued...)

[*21] General ledger account 154, captioned "Equipment - Solar Light Tower," appears to capture inventory because it has no matching subaccount for accumulated depreciation. Its entries include "solar light tower," "solar trailer," and "solar panel." That general ledger account balance, $1,062,241, was zeroed out in December 2014 (shortly after the sale of the 162 solar towers) and "reclassif[ied] to cost." This treatment in substance reflects the inclusion of inventory in COGS.

Petitioner clearly made errors in applying the accrual method of accounting. In reporting COGS on Form 1125-A, for example, it showed no opening or closing inventory and failed to account for its cost of labor. But the commission of errors in applying the accrual method is not persuasive evidence that petitioner used the cash method. Evaluating the record as a whole, we find that respondent has shown, by a preponderance of the evidence, that petitioner in fact used the accrual method of accounting, consistent with its explicit election to that effect.[5]

---

[4](...continued)
the accrual method as it is with its use of the cash method.

[5]Petitioner errs in relying on Kennedy v. Commissioner, 89 T.C. 98 (1987), which held that the IRS abused its discretion by requiring a farmer to use the accrual method even though he had elected and applied the cash method. We reasoned that a farmer's ability to elect the cash method was based on an "historical concession" by Congress and was thus not subject to the clear-reflection-of-income standard. Id. at 103. The Kennedy case has no application here: Petitioner explicitly elected the accrual method and in any event is not exempt from the

(continued...)

**[\*22]** B.　　Requirement To Use Accrual Method

Respondent determined that the accrual method of accounting was necessary to reflect petitioner's income clearly because petitioner was required to account for inventory. "In any case in which it is necessary to use an inventory[,] the accrual method of accounting must be used with regard to purchases and sales," unless otherwise authorized by the Commissioner. Sec. 1.446-1(c)(2)(i), Income Tax Regs. It is undisputed that petitioner did not seek such authorization.

A taxpayer generally must account for inventories under section 471 for any trade or business "in which the production, purchase, or sale of merchandise is an income-producing factor." Sec. 1.471-1, Income Tax Regs. Income-producing personal property constitutes "merchandise," as opposed to supplies, when it is held for sale to customers rather than being consumed as an integral part of performing a service. See RACMP Enters., Inc. v. Commissioner, 114 T.C. 211, 224 (2000); Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. 376, 385 (1999).

---

[5](...continued)
clear-reflection standard. Respondent does not seek to change petitioner's accounting method but rather seeks to bind petitioner to the consequences of the method that it elected and used.

[*23] The production, purchase, and sale of merchandise were material income-producing factors for petitioner because it was engaged exclusively in manufacturing and selling solar equipment at wholesale. For FYE 2015 petitioner had total gross receipts (as calculated by respondent) of $12,460,010 ($6,790,824 reported + $5,669,186 unreported). Petitioner included in its COGS total purchases of $5,466,935. The cost of this merchandise, representing 44% of gross receipts as calculated by respondent, was plainly a substantial income-producing factor. See Knight-Ridder Newspapers v. United States, 743 F.2d 781, 790 (11th Cir. 1984) ("[W]here the cost of raw materials * * * was 17.6% of total revenues and the actual sales price accounted for 20% of revenues, we hold that the sale of newspapers was a material income-producing factor."); Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 355 (1st Cir. 1970) (finding materials that cost between 14.7% and 15.4% of gross receipts were a substantial income-producing factor), aff'g T.C. Memo. 1969-79, 28 T.C.M. (CCH) 450; Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292, 69 T.C.M. (CCH) 3045, 3048 (finding materials that cost between 37% and 44% of gross receipts were a substantial income-producing factor).

Petitioner contends that it did not account for inventory and did not report any inventory on its tax returns. The latter proposition is true; the former is at

**[*24]** least debatable, because petitioner's general ledger account 154 for FYE 2015 appears to be an inventory account. But both propositions are irrelevant: The dispositive question is not whether petitioner actually maintained inventories but whether "it [wa]s necessary to use an inventory." Sec. 1.446-1(c)(2)(i), Income Tax Regs. As explained above, it was necessary for petitioner to use an inventory because "the production, purchase, or sale of merchandise [wa]s an income-producing factor." See sec. 1.471-1, Income Tax Regs. Indeed, the production, purchase, and sale of merchandise were the <u>sole</u> income-producing factors for petitioner's business.

Petitioner next contends that it sold the solar towers in the same year in which they were manufactured and thus had no inventory on hand at the close of the tax year. Petitioner has supplied no evidence to establish that fact for FYE 2012, 2013, or 2014, and it has supplied insufficient evidence to establish that fact with respect to its sale of solar towers during FYE 2015 to buyers other than the Fund. In any event, in determining whether petitioner was required to use the accrual method, the question is not whether it actually had inventory on hand at year end. See <u>J.P. Sheahan Assocs., Inc. v. Commissioner</u>, T.C. Memo. 1992-239, 63 T.C.M (CCH) 2842, 2844 ("[T]he fact that * * * use [of inventory] may pro-duce a zero or minimal year-end inventory is irrelevant."). The dispositive ques-

[*25] tion is whether the material that produced petitioner's income was susceptible to being inventoried. See Jim Turin & Sons, Inc., 219 F.3d at 1109 (distinguishing J.P. Sheahan where taxpayer's asphalt supplies could not be stored and were thus "not susceptible to being inventoried"). It is obvious that petitioner's solar towers, as well as their component parts, were readily susceptible to being inventoried.

Finally, petitioner urges that it qualifies for "small business" relief under Rev. Proc. 2002-28, 2002-1 C.B. 815, obsoleted by Rev. Proc. 2018-40, 2018-34 I.R.B. 320.[6] In Rev. Proc. 2002-28, the Commissioner announced that he would exercise his discretion to exempt a "qualifying small business taxpayer" from the requirements to use an accrual method of accounting under section 446 and to account for inventories under section 471. Id. sec. 1, 2002-1 C.B. at 815. The Commissioner concurrently specified the procedure that a qualifying small business taxpayer should use to secure this treatment.

To be a "qualifying small business taxpayer" under Rev. Proc. 2002-28, supra, the taxpayer must meet one of three tests. First, a taxpayer qualifies if it

---

[6]Rev. Proc. 2002-28 became obsolete following Congress' enactment, in 2017, of a "small business exemption" from the inventory requirements of section 471. See Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, sec. 13102(c), 131 Stat. at 2103 (codified as sec. 471(c)). New section 471(c), which is effective for tax years beginning after December 31, 2017, has no application to this case.

**[\*26]** reasonably determines that its "principal business activity" is described in an

NAICS code "other than one of the ineligible codes listed" in that revenue

procedure. Id. sec. 4.01(1)(a), 2002-1 C.B. at 817. One of the codes listed as

ineligible is "wholesale trade within the meaning of NAICS code 42." Id. sec.

4.01(1)(a)(iii).

Petitioner is engaged in the manufacture and sale of solar equipment at

wholesale. On each of its Federal income tax returns, it reported its business

activity as "wholesale trade" and its business activity code as 423990. That code

is within NAICS code 42. Petitioner thus cannot satisfy the first test for a "qual-

ifying small business taxpayer."[7]

Second, a taxpayer qualifies if it reasonably determines that "its principal

business activity is the provision of services, including the provision of property

incident to those services." Id. sec. 4.01(1)(b). Petitioner engaged solely in the

manufacture and sale of solar towers. It provided no meaningful services to cus-

tomers either directly or as an adjunct of its sales activity. All repair and mainte-

---

[7]Petitioner contends, contrary to the representations on its tax returns, that its principal business activity is "solar power generation" within the meaning of NAICS code 221114. We reject that contention. Petitioner does not "generate" solar power. It sells at the wholesale level equipment that supplies light using batteries that are powered in part by solar panels.

[*27] nance services provided in connection with the solar towers were performed by King Solarman LLC, a separate legal entity.

Third, a taxpayer qualifies if it reasonably determines that "its principal business activity is the fabrication or modification of tangible personal property upon demand in accordance with customer design or specifications." Id. sec. 4.01(1)(c). "For purposes of this rule, tangible personal property is not fabricated or modified in accordance with customer design or specifications if the customer merely chooses among pre-selected options (such as color, size, or materials) offered by the taxpayer or if the taxpayer must make only minor modifications to its basic design to meet the customer's specifications." Ibid.

Petitioner does not satisfy this third test for a "qualifying small business taxpayer." Far from fabricating the solar equipment "in accordance with customer design or specifications," petitioner was 100% responsible both for the design of the solar towers and for their electronic and other specifications. Regardless of whether the customer is considered to be the Fund (which purchased the towers) or the end user (which ultimately subleased them), the customer's input was limited to "choos[ing] among pre-selected options," e.g., adding a security camera as an accessory. The Commissioner explicitly stated in Rev. Proc. 2002-28 that "a taxpayer that manufactures an item in quantities for a customer"--which is exactly

[*28] what petitioner did--"is not treated as fabricating or modifying tangible personal property in accordance with customer design or specifications." Ibid.

As the Supreme Court has observed, the Code "vest[s] the Commissioner with wide discretion" in the area of inventory accounting. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979). Section 471(a) makes the breadth of that discretion clear: "Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken * * * on such basis as the Secretary may prescribe." In Rev. Proc. 2002-28, supra, the Commissioner exercised his discretion to exempt a "qualifying small business taxpayer" from the requirements to use the accrual method and account for inventories. In order to qualify for this discretionary relief, a taxpayer must satisfy one of the three tests set forth in that pronouncement. Petitioner failed to do so.

For these reasons, we conclude that petitioner was required to use the accrual method of accounting under section 446(c)(2) and to account for inventories under section 471(a). Even if petitioner had elected the cash method--which it did not do--the Commissioner would have the discretion to require that it change to the accrual method in order to reflect income clearly. See sec. 446(b) ("[I]f the method used [by the taxpayer] does not clearly reflect income, the computation of

[*29] taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income."); sec. 471(a) (requiring that inventories be taken "on such basis as the Secretary may prescribe * * * as most clearly reflecting the income"); J.H. Sheahan Assocs., Inc, 63 T.C.M. (CCH) at 2846-2848 (holding that the Commissioner did not abuse his discretion in requiring use of accrual method because the taxpayer was required to maintain inventory); Wilkinson-Beane, Inc., 28 T.C.M. (CCH) at 457-459 (same).

C.     All Events Test

Under the accrual method of accounting, a taxpayer is required to recognize income when "all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy."  Sec. 1.446-1(c)(1)(ii)(A), Income Tax Regs.; accord sec. 1.451-1(a), Income Tax Regs. As a rule, all the events necessary to fix a taxpayer's right to receive income occur upon the earliest of the date on which the income is (1) received, (2) due, or (3) earned by performance.  Johnson v. Commissioner, 108 T.C. 448, 459 (1997), aff'd in part, rev'd in part on other grounds, 184 F.3d 786 (8th Cir. 1999).  Here, the disputed portion of petitioner's proceeds from the sale of the 162 solar towers

**[\*30]** ($5,669,186) was neither due nor received during its FYE 2015.[8]  Thus, the question is whether that portion "was earned by performance" during that year and whether the amount could "be determined with reasonable accuracy."

Petitioner completed its manufacture of the 162 solar towers in December 2014.  It completed its performance under the sales contract no later than December 30, 2014, when it effected delivery, thus transferring legal title and possession of the towers to the Fund.  See Keith v. Commissioner, 115 T.C. 605, 618 (2000) (noting that "completion of a sale" during the taxable year generally requires an accrual method taxpayer to include income); Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 32 (1988) (noting that "passage of title" and "transfer of possession" are among the most significant factors in determining when a sale occurs).  Following delivery, all responsibility for repair and maintenance of the towers was shifted to King Solarman LLC, a separate legal entity; no further performance was expected from petitioner.  Finally, the amount of petitioner's accrued income was determinable "with reasonable accuracy" because that amount was specified in the sales contract and fixed by the promissory note.

---

[8]Respondent does not contend that the Fund's promissory note was negotiable or otherwise constituted receipt of payment during FYE 2015.  Cf. Schlude v. Commissioner, 372 U.S. 128 (1963); Gunderson Bros. Eng'g Corp. v. Commissioner, 42 T.C. 419, 432 (1964).

**[\*31]** Petitioner urges that the "all events" test was not satisfied, theorizing that it could "lose the ability to compel payments on the Note" if it failed to satisfy its future warranty obligations to the Fund. KSI warranted to the Fund that the solar towers would remain "in good working order" for a period of 10 years. KSI in turn had manufacturers' warranties on the principal components of those towers.

We have long "distinguished between conditions precedent, which must occur before the right to income arises, and conditions subsequent, the occurrence of which will terminate an existing right to income, but the presence of which does not preclude accrual of income." Charles Schwab Corp. v. Commissioner, 107 T.C. 282, 293 (1996), aff'd, 161 F.3d 1231 (9th Cir. 1998). Petitioner hypothesizes a future scenario in which a solar tower malfunctioned, the malfunctioning component was not covered by a manufacturer's warranty, King Solarman LLC was unable to repair the tower, the end user withheld lease payments from the Fund, and the Fund refused to make further payments on the note.

These hypothetical future events are conditions subsequent that conceivably could divest petitioner of the right to receive the full amount of sale proceeds. But the possibility that such events might occur does not negate the fact that petitioner had earned the sale proceeds, in toto, by its performance during FYE 2015. Respondent did not abuse his discretion in concluding that petitioner had completed

**[\*32]** its performance notwithstanding the existence of an unliquidated warranty obligation predicated on conditions subsequent. See, e.g., Streight Radio & Television, Inc. v. Commissioner, 280 F.2d 883, 887-888 (7th Cir. 1960), aff'g 33 T.C. 127 (1959); Keith, 115 T.C. at 617 (concluding that risk of a debtor's future default was a condition subsequent that did not preclude creditor's current accrual of income).[9]

Petitioner alternatively contends that, under the accrual method, it should be allowed a current deduction--in an amount that "just about" matches the unpaid loan proceeds--for future expenses that might arise under its warranty obligation. But an accrual method taxpayer may not "deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events that have not occurred by the close of the taxable year." Gen. Dynamics Corp., 481 U.S. at 243-244 (holding that a taxpayer could not deduct anticipated expenses for reimbursing insurance claims until such claims were actually filed). The last event required to fix the liability for a warranty claim, as for an insurance claim, "occurs no sooner than when a claim is filed." Chrysler Corp. v. Commissioner, T.C. Memo. 2000-283, 80 T.C.M. (CCH) 334, 338, aff'd, 436 F.3d 644 (6th Cir. 2006).

---

[9]Should future events occur that divest KSI of its right to receive a portion of the sale proceeds, an adjustment to its income would be made for that future year. See sec. 1.451-1(a), Income Tax Regs.

**[*33]** Petitioner does not contend that it received any warranty claims during FYE 2015, and it is thus entitled to no deduction for warranty expenses.[10]

### D.    Installment Sale

Petitioner alternatively contends that it should be permitted to report proceeds from its sale of the 162 solar towers on the installment basis.  Under section 453(c), the income recognized for any taxable year from a disposition of property "is that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price."  Petitioner did not report its income from the sale of the 162 towers as required by section 453(c).  The income it reported had nothing to do with its gross profit percentage on the sales contract; it simply reported the cash it received during FYE 2015.

We need not decide whether petitioner should be viewed as having elected installment treatment, however, because the statute precludes use of the install-

---

[10]Even if all the events were thought to have occurred to fix petitioner's warranty liability, it has supplied no rational basis for determining how that liability would be estimated.  Far from showing that its future warranty costs were "statistically certain," Gen. Dynamics Corp., 481 U.S. at 243, KSI merely speculates that such expenses might arise and be in an amount that "just about" matches the unpaid loan proceeds.  It is obvious that the amount of its future warranty liability cannot "be determined with reasonable accuracy."  See sec. 1.446-1(c)(1)(ii)(A), Income Tax Regs.

[*34] ment method in these circumstances. Section 453(b)(2)(B) provides that the term "installment sale" does not include any "disposition of personal property of a kind which is required to be included in the inventory of the taxpayer if on hand at the close of the taxable year." As explained previously, the 162 solar towers constituted "personal property," specifically "merchandise." See supra p. 22. Whether or not petitioner actually included them in inventory, they were property "of a kind" required to be included in inventory. And regardless of how much closing inventory petitioner actually had for FYE 2015, the solar towers were property of a kind required to be included in inventory "if on hand at the close of the taxable year." Sec. 453(b)(2)(B) (emphasis added). In short, for the same reasons that petitioner was required to maintain inventories and use the accrual method, it was ineligible to report its income under the installment method.[11]

There are sound policy reasons why the Code precludes deferral of income on sales of inventory property in such circumstances. Petitioner sold about $8 million of inventory to the Fund. The Fund immediately began claiming bonus depre-

---

[11]Petitioner errs in relying on Mamula v. Commissioner, 346 F.2d 1016 (9th Cir. 1965), rev'g and remanding 41 T.C. 572 (1964). In that case the Court of Appeals allowed a taxpayer to elect the installment method after the method the taxpayer had initially selected (the "deferred payment" method) was set aside at the Commissioner's instance as impermissible. Id. at 1018. Here, petitioner cannot elect the installment method because section 453(b)(2)(B) prevents it from doing so.

[*35] ciation and tax credits keyed to the full $8 million purchase price, and those tax benefits flowed through immediately to its investors. Petitioner in turn claimed a current tax benefit--as COGS or business expense deductions--for 100% of the material and labor costs attributable to the 162 solar towers. If petitioner were allowed to defer recognition of $5,669,186--more than 70% of the proceeds derived from sale of the towers--for up to 20 years, it would produce an anomalous mismatch between the income and the associated deductions and credits.

E.    Accuracy-Related Penalty

The Code imposes a 20% penalty on the portion of any underpayment of tax attributable to a "substantial understatement of income tax." Sec. 6662(d)(1)(B). Respondent has no burden of production with respect to the penalty where (as here) the taxpayer is a corporation. Cf. sec. 7491(c) (providing that the Secretary shall have the burden of production "with respect to the liability of any individual for any penalty"); NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006).

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." If supervisory approval is not timely secured for a penalty subject to section 6751(b)(1), the penalty generally will not be sustained. Graev v. Commissioner,

**[*36]** 149 T.C. 485, 493 (2017), <u>supplementing and overruling in part</u> 147 T.C. 460 (2016).

The RA in this case recommended the assertion of a substantial understatement penalty under section 6662(b)(2). That recommendation was approved in writing by his immediate supervisor on September 6, 2016, as evidenced by a Civil Penalty Approval Form included in the record. Petitioner does not challenge the timeliness of that approval, which was secured nine months before the IRS mailed the notice of deficiency on June 28, 2017. We find that the IRS satisfied the requirements of section 6751(b)(1).

The section 6662 penalty does not apply to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to * * * [it]." Sec. 6664(c)(1). The decision whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances." <u>Ibid.</u>

A taxpayer may demonstrate reasonable cause and good faith by relying on the advice of a professional tax adviser. <u>Id.</u> para. (c). "All facts and circumstances

**[*37]** must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice." Id. subpara. (c)(1). Relevant facts include "the taxpayer's education, sophistication, and business experience." Ibid. Reliance on advice may be unreasonable if the taxpayer fails to disclose all relevant facts to his adviser or "if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law." Ibid.

Although Mr. Cung has a college degree, he had no knowledge regarding tax law, and English is his second language. He retained a CPA to prepare KSI's return for each year of its existence. The accounting issues we have addressed present technical questions of the sort a reasonable businessperson would refer to his accountant, to whom Mr. Cung made full disclosure of all relevant facts.

Petitioner's CPA did a less-than-masterful job in preparing KSI's returns, but we are convinced that Mr. Cung did not know, and had no reason to know, of any deficiencies in that respect. We do not fault Mr. Cung for not questioning his accountant when he was aware of no reason for doing so. See United States v. Boyle, 469 U.S. 241, 251 (1985) ("Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney."). Petitioner's failure to call his CPA to testify at trial cuts somewhat in respondent's favor. But having

**[*38]** listened to Mr. Cung's testimony and reviewed the record as a whole, we find that there was reasonable cause for petitioner's underpayment of tax and that Mr. Cung, petitioner's CEO and sole shareholder, "acted in good faith" with respect to it. Sec. 6664(c)(1); see Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Accordingly, we will not sustain the penalty.

To implement the foregoing,

Decision will be entered under

Rule 155.